**Fred B. LEATHERS, Jr., Plaintiff,**

v.

**PFIZER, INC. & Warner–Lambert Company LLC, Defendant.**

**No. CIV.A.1:04CV00615.**

United States District Court, N.D. Georgia, Atlanta Division.

March 10, 2006.

James Randolph Schulz, Ragsdale Beals Hooper & Seigler, Atlanta, GA, for Plaintiff.

Leeann Jones, Melissa Davis Strickland, Vernon Robert Denham, Jr., Powell Goldstein LLP, Atlanta, GA, Mark S. Cheffo,

Skadden Arps Slate Meagher & Flom, New York, NY, for Defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This toxic tort diversity action is currently before the Court on Defendants' Motion to Exclude the Opinions of Mark R. Firth, M.D. [# 72], Defendants' Motion for Leave to File Excess Pages [# 70], Defendants' Motion for Summary Judgment [# 71], Defendants' Motion to File Under Seal Certain Portions of Exhibits to Their Motion for Summary Judgment [# 75], Defendants' Motion for Scheduling Order [# 78], Defendants' Motion for Leave to File Excess Pages [# 95], Defendants' Motion to Strike [# 98], Defendants' Motion for Leave to File Response to Plaintiff's Notice of Subsequent Authority [# 113]; Defendants' Motion for Ruling on the Record [# 124]; and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Brief Document [# 129].

On February 1, 2006, United States District Judge William S. Duffey, Jr. conducted a *Daubert* hearing on Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72]. The hearing also addressed issues related to Defendants' Motion to Strike. Counsel for both parties delivered oral arguments on the matter. Neither Dr. Firth nor the subjects of Defendants' Motion to Strike were in attendance. After the hearing but prior to ruling on Defendants' motions, Judge Duffey recused himself and the case was transferred to the undersigned judge.

For the following reasons, Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72] and Defendants' Motion for Summary Judgment [# 71] are GRANTED. Defendants' Motion to Strike [# 98] is GRANTED IN PART and DISMISSED AS MOOT IN PART. Defendants' Motions for Leave to File Excess Pages [# 70 & # 95], Defendants' Motion to File Under Seal [# 75], and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Authority [# 113] are GRANTED NUNC PRO TUNC. Defendants' Motion

for Scheduling Order [# 78] and Defendants' Request for Ruling on the Record [# 124] are DISMISSED AS MOOT.

## I. *Background*

The following facts are undisputed unless otherwise noted. Defendant Pfizer, Inc. ("Pfizer") is a foreign corporation in the business of pharmaceutical manufacturing, marketing, and sales. Pfizer makes Lipitor, the prescription medication at issue in this lawsuit. Defendant Warner–Lambert Company ("Warner–Lambert") is a subsidiary of Pfizer. Through an unincorporated division called Parke–Davis, Warner–Lambert manufactures and sells Lipitor in the United States and, more specifically, in Georgia. According to the Complaint, Defendants began selling Lipitor in the United States in 1997 after garnering approval from the Food and Drug Administration ("FDA").

Lipitor is in a class of drugs called statins, which inhibit a certain enzyme in the liver from producing the kind of cholesterol responsible for clogging blood vessels. Lipitor is commonly prescribed to reduce cholesterol levels, thereby reducing the risk of heart attack, stroke, and other related maladies. By virtue of being a statin, Lipitor has certain widely recognized side effects. Defendants freely admit that physicians have long been aware of "certain muscle-related adverse events [that] have been associated with statin drugs." Defs.' Mot. 3. Defendants also acknowledge that "in some class or some subset of people they can basically have [rhabdomyolysis], renal failure and death … with respect to statins." Firth Trans. 35:8–12. Plaintiff and Defendants, however, dispute whether Lipitor can cause the permanent, milder form of diffuse muscle ailment that Plaintiff claims to have. Plaintiff and Plaintiff's doctors refer to Plaintiff's alleged injury as "statin-induced myopathy."

Plaintiff's first exposure to Lipitor was in August of 2001. He was 69 years old at the time. Dr. Mark R. Firth, Plaintiff's general internist, prescribed 10 milligrams of Lipitor per day to Plaintiff. A few months later (on or about February 20, 2002 according to Plaintiff's Complaint), Plaintiff's dosage increased to 20 milligrams of Lipitor per day. According to Dr. Firth's expert report,[1] "within a few weeks [of the increase in dosage, Plaintiff] developed signs and symptoms consistent with myopathy including extreme fatigue, weakness and diffuse muscle pain."

Plaintiff discontinued Lipitor and underwent tests. Dr. Firth did a blood test which showed that Plaintiff's creatine phosphokinase levels were normal, indicating that Plaintiff did not have rhabdomyolysis. Dr. Firth referred Plaintiff to Dr. Linker, a rheumatologist, and Dr. Novey, a neurologist. After brief consultations, both doctors concluded that Plaintiff's ailments were linked to Lipitor.

Plaintiff claims that his muscle pain did not abate when he discontinued Lipitor. He claims that as a result of taking Lipitor, he has suffered from "grievous injuries, including, but … not limited to, muscular weakness, severe muscle pain, multiple myalgias, myositis, a myopathic syndrome, and permanent disability." Compl. ¶ 3. Plaintiff alleges that Defendants knew that Lipitor had the potential to cause these permanent side effects, but that Defendants inadequately warned the FDA, doctors, and consumers of these risks. Plaintiff's claims include defective design, failure to warn, negligence, breach of express warranties, breach of implied warranties, and unjust enrichment. He seeks compensatory, punitive, and exemplary damages.

## II. *Toxic Tort Litigation & Causation*

Toxic tort litigation is a subset of products liability in which "cases … are won or lost on the strength of the scientific evidence presented to prove causation." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir.2002). Recently, the United States Court of Appeals for the Eleventh Circuit noted that "toxic tort cases usually come in two broad categories: first, those cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue, and second, those cases in which the medical community does not generally recognize the agent as both toxic and causing the

---

1. While Dr. Firth is Plaintiff's treating physician, he has also been designated as an expert witness.

injury plaintiff alleges." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir.2005). In the first type of toxic tort case, the Court "need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *Id.* In other words, general causation [2] is already established, leaving only specific causation at issue for trial. In the second type of case, the plaintiff bears the burden of establishing both general and specific causation.

■ The parties dispute which category the instant case falls into. Plaintiff argues that because the medical community recognizes that Lipitor (and statins in general) cause muscle-related ailments, general causation is already established. Defendants, on the other hand, insist that while the medical community recognizes that statins can cause certain maladies, the medical community also believes that discontinuing the medication will correct the problems. They argue that the type of general causation Plaintiff asserts—one where statins cause prolonged and even permanent damage—is not recognized in the medical community; thus, Plaintiff must establish both general and specific causation.

After carefully reviewing the articles and adverse incident reports of record in this case, the Court agrees with Defendants. The statin side effect recognized in the medical community is a temporary one that ends when the patient stops taking the drug. Plaintiff attempts to extrapolate this temporary side effect to establish general causation of a much more serious, permanent illness. However, *Daubert* decisions "warn against leaping from an accepted scientific premise to an unsupported one." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999). Thus, Dr. Firth's statements regarding both general and specific causation must undergo a *Daubert* analysis.

**2.** " 'General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease.' " *McClain*, 401 F.3d

### III. Defendants' Motion to Exclude Dr. Firth's Opinions

#### A. Legal Standard

Federal Rule of Evidence ("FRE") 702 lays the foundation for this Court's *Daubert* analysis, providing as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court observed that "unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Because of this latitude, the "trial judge must determine at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether . . . the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology can properly be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. "*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain*, 401 F.3d at 1237. The burden rests upon the party seeking to present the expert testimony to establish admissibility by a preponderance of the evidence. *Id.*

Under *Daubert*, expert testimony is admissible if: (1) the expert is competent and qualified to testify regarding the subject matter of his testimony; (2) the methodology

at 1239 (quoting Michael D. Green et al., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 392 (Federal Judicial Center, 2d ed.2000)).

by which the expert reached his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that assists the trier of fact to understand the evidence or determine a fact in issue.

■ Regarding the first element, the expert must be "competent and qualified by knowledge, skill, experience, training, or education to render the opinion." *Siharath v. Sandoz Pharm. Corp.*, 131 F.Supp.2d 1347, 1351 (N.D.Ga.2001), *aff'd sub nom. Rider*, 295 F.3d 1194 (11th Cir.2002). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question . . . . Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony not its admissibility. Thus, Rule 702 takes a liberal approach to expert witness qualification." 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure; Evidence* § 6265 (West 1997).

■ Regarding the second element, in order to be reliable, expert testimony must be supported by scientific knowledge. The *Daubert* Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedure of science. Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. It set forth four nonexhaustive criteria for determining whether expert testimony is based on reliable scientific knowledge: (1) whether the theory can and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error associated with the theory; and (4) whether the theory or methodology employed is generally accepted in the field. *Daubert*, 509 U.S. at 593–95, 113 S.Ct. 2786; *Rider*, 295 F.3d at 1197. In toxic tort cases, a "lack of epidemiological studies supporting [a plaintiff's] claims creates a high bar for [a plaintiff] to surmount with respect to the reliability requirement." *Siharath*, 131 F.Supp.2d at 1358.

Finally, the last factor requires that the expert opinion be relevant to the facts of the case. In other words, there must be a valid scientific connection to a material issue in the case. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (explaining that this final element requires a "fit" between the expert opinion and the facts of the case).

## B. *Dr. Firth's Expert Report*

On October 15, 2004, Plaintiff filed an amendment to the initial disclosures required under Federal Rule of Civil Procedure ("FRCP") 26, designating his general internist, Dr. Mark R. Firth as an expert for trial. Pursuant to FRCP 26(a)(2)(B), Plaintiff submitted Dr. Firth's expert report, which provides as follows:

Coronary Heart disease and stroke are leading causes of morbidity and mortality in the United States. As a general internist for the past 21 years I have spent a significant amount of my professional time and effort dealing with the prevention and treatment of theses [sic] cardiovascular diseases. I have also attended numerous lectures on these topics and have read countless related articles. One of the major areas of concern in this population of patients has been the role of cholesterol levels in modifying the disease process. Although diet and exercise remain the foundation of therapy, the use of cholesterol lowering medications, especially statins, has become increasingly important. A large body of medical literature now promotes the prescribing of these drugs in an attempt to achieve "goal" levels of LDL-cholesterol. Recent recommendations call for even lower levels in increasingly large portion of patients.

The safety of these drugs has generally been described by both the pharmaceutical industry and most researches [sic] as "excellent", "superb", and "enviable". The occasional effect on the liver causing elevated liver enzymes has been well publicized and has led to periodic [sic] monitoring of blood tests. Much less discussed and poorly understood is the statin associated myopathy which I have found occurs more often in clinical practice than the medical literature and drug companies admit to. Physicians have been warned for a number of years about the rare extreme form of myopathy,

rhabdomyolyis [sic], associated with muscle damage and elevated muscle enzymes that can lead to renal failure and death. Much less information has been shared regarding the more common forms of myopathy causing weakness and pain which can be severe, debilitating, and persist even after the drug has been withdrawn. I have seen these forms of myopathy more and more as the use of statins has increased, especially with atrovastatin [sic] (Lipitor).

One of my patients, Mr. Fred Leathers, was started on a low dose of Lipitor in August [sic] 2001. At that time the only warnings about statin related myopathy in the Physicians Desk Reference and from pharmaceutical representatives related to rhabdomyolysis with virtually no mention of other musculoskeletal problems. A few months later Mr. Leathers' Lipitor dose was increased to 20 mg to lower LDL cholesterol to goal levels recommended by guidelines. Within a few weeks he developed signs and symptoms consistent with myopathy including extreme fatigue, weakness and diffuse muscle pain. Lipitor was discontinued and blood work was obtained which failed to show evidence of rhabdomyolysis. At the time physicians were led to believe that this would essentially "rule out" statin associated myopathy. An extensive search for other possible explanations for Mr. Leathers' symptoms failed to find any abnormalities. The consensus among his physicians was Lipitor was indeed the cause of his illness.

Unfortunately [sic], despite the withdrawal of Lipitor, Mr. Leathers has continued to suffer significant problems, contrary to the information from the literature and drug companies. Since then I have had several other patients with a very similar clinical course from taking statins in general and Lipitor in particular. I had the opportunity recently to review a large number of "suspected adverse drug reports" and I am shocked to realize how frequently such problems are occurring with Lipitor. There have been more concerns expressed by other patients and physicians leading to several special reports on the network news. Despite this revelation the pharmaceutical industry has continued to downplay the frequency and significance of the problem. Only recently has information in the medical literature surfaced regarding statin induced myopathy.

I am very concerned that the new recommendation for more aggressive and broader use of these drugs, especially Lipitor, will lead to increased numbers of patients who developed symptoms similar to Mr. Leathers and so many others. In my own practice I have become more reluctant to use statins despite the urging of "experts". I now discuss at length the possibility for side effects and in great detail describe the potential for musculoskeletal problems. Not infrequently patients decide to avoid statin therapy. If I had been given more information 3 years ago to share with my patients, Mr. Leathers [sic] situation could have been avoided.

Pl.'s Amend. to Initial Disclosures Ex. 1.

### C.  Daubert Analysis

█ At the outset, Plaintiff raises the issue of whether *Daubert* should apply to Dr. Firth's testimony. In his response brief, Plaintiff seems to imply that because Dr. Firth has personal knowledge of Plaintiff's ailments as his treating physician, *Daubert* does not apply. Plaintiff states:

> Here, Dr. Firth, [Plaintiff]'s family physician for over ten years, is testifying about what he did after [Plaintiff] came to him for treatment complaining about muscle pain and weakness. The Fourth Circuit has held that a treating physician's diagnosis of his patient's ailments does not have to meet *Daubert* standards because he is a fact witness observing the condition of a patient.

Pl.'s Resp. 22–23 (internal citations omitted).

Dr. Firth's status as Plaintiff's treating physician does not immunize his testimony from *Daubert.* The subject of this motion to exclude is Dr. Firth's opinions regarding causation. These opinions clearly fall within FRE 702's scope of "scientific knowledge." Therefore, Dr. Firth's opinion is an expert opinion and must satisfy *Daubert* and Rule 702.

#### 1. Dr. Firth's Qualifications

■ Dr. Firth is a general internist. He earned his medical degree from the Medical College of Georgia (1976–1980), and he completed his residency in Internal Medicine at the Memorial Medical Center in Savannah, Georgia in 1983. Dr. Firth spent four years as Chief of the Specialty Clinic at Hawley Army Community Hospital. From 1987 to present, he has practiced as a general internist at Athens Internal Medicine Associates. He is certified by the National Board of Medical Examiners and the American Board of Internal Medicine. He has been a member of the American College of Physicians since 1984.

The Court is skeptical about Dr. Firth's qualifications to opine on an issue such as general causation. In *Siharath*, 131 F.Supp.2d at 1363, the Court stated that "[w]ith respect to general causation, the relevant scientific field is epidemiology or toxicology and not clinical medicine." Dr. Firth is strictly a clinical practitioner, not an epidemiologist, toxicologist, or a pharmacologist. He has not written or published articles or case studies nor has he conducted any other research on statins. Dr. Firth does have substantial experience with treating patients for high cholesterol and prescribing Lipitor. However, he has very little experience with permanent musculoskeletal disorders. Dr. Firth and counsel for Defendants had the following exchange at Dr. Firth's deposition:

> Q. Doctor, do you consider yourself an expert in statins?
>
> A. I consider myself knowledgeable for a general internist in statins. An expert in statins, no, I would not say I'm an expert in statins.
>
> Q. Do you consider yourself an expert in drug-induced adverse reactions?
>
> A. No.
>
> Q. Do you—Are you a muscle expert?

A. No.

Firth Trans. 54:5–15.

While the Court has reservations about Dr. Firth's qualifications, it also is mindful of the liberal approach taken in qualifying a witness as an expert. Therefore, the Court finds that Dr. Firth does qualify as an expert.

#### 2. Reliability: Dr. Firth's General Causation Opinion

■ Dr. Firth's FRCP 26(a)(2)(B) expert report does not directly address the issue of general causation (presumably because Plaintiff is of the opinion that he need not prove general causation). Dr. Firth indicates that he relied upon adverse incident reports and medical articles attached to his report in arriving at the opinion that Lipitor was the specific cause of Plaintiff's alleged injuries. The Court, therefore, will assume that the adverse incident reports and articles were the basis for Dr. Firth's implicit opinion that Lipitor generally can cause Plaintiff's alleged injuries.

As an initial matter, adverse incident reports generally do not, standing alone, render an expert's opinion reliable under *Daubert*. In *Rider*, 295 F.3d 1194, the Eleventh Circuit stated that "courts must consider that case reports are merely accounts of medical events. They reflect only reported data, not scientific methodology. Some case reports are a very basic form report of symptoms with little or no patient history, description or course of treatment, or reasoning to exclude other possible causes." *Id.* at 1199. The *Rider* court concluded that "the contents of [the] case reports were inadequate . . . to demonstrate a relationship between a drug and a potential side effect." *Id.* Even Dr. Firth agreed that the adverse incident reports attached to his report do not establish causation. Firth Trans. 213:7–9.[3]

Having carefully read Dr. Firth's deposition transcript and the reports and articles attached to his expert report, the Court finds

---

3.

> Q. And you also know just from reading those few adverse events that they don't determine causation, right?
>
> A. Say that—the reports themselves do not—
>
> Q. Yeah. You can't make a causal determination—
>
> A. Right. Right.

that *Daubert* mandates excluding Dr. Firth's opinion. Many of the articles attached to the report do not address the relationship between statins and muscle-related side effects. Among the scant passages actually discussing muscle-related side effects, the Court found the following quotations: "symptoms resolve completely with statin discontinuation;" "despite the clinical importance of statin-induced myopathy, we understand very little about its causes, which makes it hard to develop good treatments or preventive strategies;" "little is known about the mechanism by which statin therapy leads to muscle toxicity;" "the patient's symptoms ... improved 3 months after she had discontinued statin therapy ... [and] muscle biopsy showed complete resolution of the pathologic abnormalities;" "repeated muscle biopsy performed 3 months after discontinuation of statin therapy revealed complete resolution;" and "repeated biopsy done after the patient had not received statin therapy for 5.5 months showed resolution." These articles fail to support Dr. Firth's opinion and do not create a scientifically valid causal link between Lipitor and statin-induced myopathy.

Research addressing the relationship between Lipitor (and, more generally, statins) and Plaintiff's alleged injury is still in an immature stage and does not possess the level of reliability required by *Daubert*. At his deposition, Dr. Firth stated that he was unaware of any report or article that established a causal link between statins and Plaintiff's injury.

> **Q.** Are you aware of any ... peer-review study which basically says from a causal factor that they've seen any evidence of people with no [creatine phosphokinase] elevations who have some kind of muscle pain and weakness—but—
>
> **A.** Has it been done? No, I've not seen it. I'd love to.
>
> . . .
>
> **Q.** Are you aware of any peer-review studies or reports which would show with any kind of statistical reliance that people who take Lipitor who have no—who have no [creatine phosphokinase] elevations and who have muscle pain and weakness have a continuing disability—

> **A.** No.
>
> **Q.** for myopathy after, you know, months or years?
>
> **A.** I've seen no studies that address that.

Firth Trans. 152:13–153:10. As Judge Posner has stated, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996).

In sum, Dr. Firth's opinion and the articles and reports on which he relies fall short of *Daubert's* requirements. Therefore, the Court concludes that Dr. Firth's opinions should be excluded.

### 3. *Reliability: Dr. Firth's Specific Causation Opinion*

■ Having concluded that Plaintiff's expert failed to establish general causation, the Court need not discuss specific causation. However, it notes that Dr. Firth's specific causation opinion is problematic as well. First, Dr. Firth testified that Plaintiff does not have some of the diseases he alleges to have in his Complaint. Dr. Firth testified that "[Plaintiff] has a normal [creatine phosphokinase] level. He does not have mild myalgia. He does not have [rhabdomyolisis]. He does not have myositis." Firth Trans. 199:16–19. This directly contradicts Plaintiff's Complaint, which claims that Plaintiff's injuries include "multiple myalgias [and] myositis."

Second, Dr. Firth's specific causation opinion falls more in the category of an intuitive, clinical hunch than a reliable, scientific, expert opinion. Dr. Firth's opinion is that Plaintiff has "statin-induced myopathy," which he describes as a diffuse, nebulous muscle ailment that is incapable of definitive diagnosis. "Did we make a definitive diagnosis? I don't think so. I don't think you can in those people .... I think it's one of those entities that you're stuck with, you know, based on clinical presentation and sequence of events and the whole slew of things that you make your best decision on." Firth Trans. 221:6–18.

Dr. Firth testified that he referred Plaintiff to a rheumatologist, Dr. Linker, and neu-

rologist, Dr. Novey, who examined Plaintiff once and concluded that Plaintiff's problems were caused by Lipitor. However, Dr. Firth admits that, to his knowledge, Plaintiff never had a muscle biopsy, which is reputed to be the "gold standard" for determining whether a person's pains are statin-induced; or an EMG, which measures whether muscles have lost strength; [4] or a nerve conduction study, which provides an objective measure of muscle pain. In fact, Dr. Firth testified that he was not aware of any test that "rules in statin-induced myopath," Firth Trans. 100:15–17, and that he could not rule out the possibility that Plaintiff has an underlying muscle disease. The Court also notes that when Dr. Firth wrote his expert report on October 13, 2004, he had not seen Plaintiff since August 2003. Dr. Firth admitted that he could not testify as to whether Plaintiff's problems resolved, worsened, or remained the same since August 2003. These statements prove that Dr. Firth's opinion is not based on reliable, scientific methodology.

Finally, Dr. Firth's deposition indicated that one of the most critical factors on which he relied in formulating the opinion expressed in his expert report was the temporal proximity of Plaintiff's ailments to the ingestion of Lipitor. Firth Trans. 100:8–10. In *McClain*, 401 F.3d at 1243, the Eleventh Circuit cautioned that to assume causality from temporal sequence is to subscribe to the *post hoc, ergo propter hoc* [5] fallacy. While the temporal relationship between a drug and symptoms may have some utility to a clinical practitioner such as Dr. Firth, heavy reliance on such a relationship does not withstand scrutiny under *Daubert*.

For the foregoing reasons, even if Dr. Firth's opinion was sufficiently reliable on the issue of general causation, his testimony regarding specific causation does not satisfy *Daubert*.

#### 4. *Relevance*

The Court need not analyze the relevance of Dr. Firth's expert report because Plaintiff has not satisfied *Daubert's* other requirements.

In sum, the Court finds that Dr. Firth's opinion does not pass muster under Rule 702 and *Daubert*. Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. is GRANTED.

### IV. *Defendants' Motion to Strike*

Defendants' Motion to Strike concerns the following documents: (1) the declaration of Dr. Firth; (2) the declarations of Drs. Novey and Linker; and (3) the deposition transcript of Dr. Paul Phillips, which was taken by counsel for Defendants in a different case involving Lipitor brought in California.

FRCP 26(a) and 37(c)(1) provide the legal basis for Defendants' Motion to Strike. FRCP 26(a)(2)(A) applies generally to any witness who will deliver an expert opinion under FRE 702. It requires that "a party shall disclose to other parties the identity of any person who may be used at trial to present . [expert testimony]." FRCP 26(a)(2)(B) requires additional disclosures with respect to a "witness who is *retained* or *specially employed* to provide expert testimony in the case." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). When FRCP 26(a)(2)(B) applies, the expert must file an expert report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor [along with] the data or other information considered by the witness."

Treating physicians generally are not subject to the FRCP 26(a)(2)(B) requirements. They are not considered "retained" or "specially employed" to the extent their testimony concerns their personal care, diagnosis, and treatment of a patient. "The approach taken by a majority of courts when determining whether to require treating physicians to provide Rule 26(a)(2)(B) reports is that the plaintiff[ ] can not avoid the requirements of Rule 26 by simply indicating that [her] experts are plaintiffs' treating physician.... Rule 26 focuses not on the status of the

---

**4.** According to Dr. Firth, an EMG would shed light on the cause of the loss of muscle strength.

**5.** According to Black's Dictionary, the literal translation of *post hoc, ergo propter hoc* is "after this, therefore because of this." *Black's Law Dictionary* 1205 (8th ed.2004).

witness, but rather the substance of the testimony." *Brown v. Best Foods,* 169 F.R.D. 385, 388 (N.D.Ala.1996) (internal quotations and citations omitted). *See also Green v. Office of the Sheriff's Office,* 2002 U.S. Dist. LEXIS 26485, at *16–17 (M.D.Fla.2002) ("[T]he key to the treating physician's being excused from the report requirement is that she testify only as to observations made during the care and treatment of the party."); *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* 227 F.R.D. 421, 423–24 (M.D.N.C.2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition. However, because of the physician's specialized training and knowledge, when the physician testifies, he or she testifies as an expert witness. Therefore, the physician must be disclosed as an expert because he or she is relying on scientific, technical, or other specialized knowledge. When the treating physician goes beyond the observations and opinions obtained by treating the individual and expresses opinions acquired or developed in anticipation of trial, then the treating physician steps into the shoes of an expert who may need to provide a Rule 26(a)(2)(B) report."); *Wreath v. United States,* 161 F.R.D. 448, 449 (D.Kan.1995) ("To the extent that the treating physician testifies only as to the care and treatment of his/her patient, the physician is not to be considered a specially retained expert notwithstanding that the witness may offer opinion testimony under Fed. R.Evid. 702, 703 and 705.").

■ The consequences for failure to comply with FRCP 26(a) are contained in FRCP 37(c)(1), which states as follows: "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence ... on a motion any witness or information not so disclosed." The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party. *See Go Med. Indus. Pty. v. Inmed Corp.,* 300 F.Supp.2d 1297, 1308 (N.D.Ga.2003); *see also Burney v. Rheem Mfg.,* 196 F.R.D. 659, 691 n. 29 (M.D.Ala.2000); *Rabello v. Bell Helicopter Textron,* 200 F.R.D. 484, 489 (S.D.Fla. 2001).

With this in mind, the Court addresses Defendants' Motion to Strike.

### A. *Declaration of Dr. Firth*

Dr. Firth's declaration was attached to Plaintiff's response to Defendants' Motion for Summary Judgment. Defendants challenge paragraphs 3–6 of the declaration, which provide as follows:

3. It is generally recognized within the medical community that statins can cause myalgias and myopathies, which in some patients persist after the drug is discontinued. Not only can I state this from personal experience, but also from the medical literature.

4. Many articles in the medical literature have described patients, like [Plaintiff], who had normal [creatine phosphokinase levels] and statin-induced muscle disorders.

5. Exercise has been reported to increase the muscle pain associated with statin induced muscular problems.

6. Based upon my first-hand observation of [Plaintiff], my professional experience, and my consultations with Dr. Joe B. Linker, III and Dr. Edward S. Novey, I believe with reasonable medical certainty that [Plaintiff's] myalgia and myopathy were caused by his ingestion of Lipitor.

Dr. Firth Decl. ¶ 3–6 (internal citations omitted).

Defendants claim that the opinions in the declaration are different from the opinions contained in Dr. Firth's original expert report. Defendants argue that this is a violation of FRCP 26(a)(2)(B), which requires the expert report to provide complete disclosure of "all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B). Defendants urge the Court to strike the paragraphs as authorized by FRCP 37(c)(1). Plaintiff, on the other hand, claims "the opinions [Dr. Firth] expressed in his declaration are the same as those he provided in his report." Plaintiff claims that he has not violated FRCP 26(a)(2)(B) because the declaration does not contain new opinions.

The issues raised with respect to Dr. Firth's declaration are of no consequence. If the Court were to accept Plaintiff's argument that the declaration contains the same opinions as the expert report, then the declaration would not change the Court's ruling that Dr. Firth's expert opinions do not satisfy *Daubert* and FRE 702. Additionally, it would not disturb the Court's granting of Defendants' Motion for Summary Judgment because Plaintiff still cannot establish general causation. Therefore, the Court dismisses this portion of Defendants' Motion to Strike as moot.

### B. *Declarations of Doctors Novey & Linker*

A brief background of some relevant deadlines and chronology is appropriate before discussing the parties' contentions. In an Order [# 25] entered on August 13, 2004, the Court set October 15, 2004 as the due date for "[r]eports from retained experts." On October 15, 2004, Plaintiff designated only Dr. Firth as a retained expert and submitted his expert report pursuant to FRCP 26(a)(2)(B). Plaintiff did not designate any witnesses as experts under FRCP 26(a)(2)(A) at that time.

On February 4, 2005, the Court entered a Consent Order, postponing further discovery until after the Court ruled on motions that Defendants anticipated filing by March 1, 2005. On March 1, Defendants filed a Motion to Exclude the Opinions of Dr. Mark R. Firth and a Motion for Summary Judgment. On March 18, 2005, Plaintiff responded to Defendants' Motion to Exclude and attached Dr. Novey's and Dr. Linker's declarations. At the time the declarations were submitted, Drs. Novey and Linker had been designated only as fact witnesses. It was not until April 6, 2005 that Plaintiff filed an amendment to initial disclosures, adding Drs. Novey and Linker as experts "out of an overabundance of caution."

Defendant moved to strike certain portions of both doctors' declarations which Defendants claim constitute expert opinions. Defendants challenge the purported expert opinions on the grounds that Plaintiff never properly or timely identified the doctors as experts.

The Court first addresses the statements in Dr. Novey's declaration. Defendants object to the second and third sentences in paragraph 6 of Dr. Novey's declaration, in which Dr. Novey states as follows: "My opinion is based on reasonable medical certainty. It is generally recognized in the medical community that Lipitor and other drugs in its class have side effects which include muscle problems such as myalgias and myopathy." Defendants claim that these statements rise to the level of an expert opinion and should be stricken. The Court agrees with Defendants.

Plaintiff conceded at the *Daubert* hearing that these statements constitute expert opinions under FRE 702. However, Plaintiff argues that the October 15 deadline set by the Court expressly applied only to expert reports submitted by retained experts under FRCP 26(a)(2)(B). Plaintiff contends that the deadline did not apply to Drs. Linker and Novey because they qualify as treating physicians (rather than retained or specially employed experts) and are governed by FRCP 26(a)(2)(A).

Plaintiff's argument is incorrect. Dr. Novey's statements are the statements of a retained expert. In *Brown v. Best Foods*, 169 F.R.D. 385, 388 (N.D.Ala.1996), the court stated that treating physicians are not "retained" or "specially employed" to the extent that they deliver expert opinions relating to their care or treatment of a party to the lawsuit. *Brown* also emphasized that the appropriate analysis "focuses not on the status of the witness, but rather the substance of the testimony." *Brown*, 169 F.R.D. at 388 (internal quotations and citations omitted).

The challenged portion of Dr. Novey's declaration has nothing to do with the care or treatment of Plaintiff. Dr. Novey's statement is an opinion relating to general causation; that is, the statement pertains to whether the medical community generally recognizes that Lipitor can cause the type of harm suffered by Plaintiff. Although Dr. Novey was, in fact, one of Plaintiff's treating physicians, in substance Dr. Novey's statement is not one of a treating physician—it is

the statement of a retained or specially employed expert under FRCP 26(a)(2)(B). Therefore, the Court's October 15 deadline applied to Dr. Novey's declaration.

Under FRCP 37(c)(1), Plaintiff may still avoid having Dr. Novey's declaration stricken if he shows that the failure to disclose was substantially justified and harmless. Plaintiff has not met this burden. First, Plaintiff's nondisclosure is not substantially justified because the conduct of Plaintiff indicates that he understood the October 15 expert deadline to apply to all experts. Defendants correctly point out that "Plaintiff clearly knew and understood his obligations under the rules, and that is precisely why he formally designated Dr. Firth as an expert, within the prescribed time period, even though Dr. Firth was, like Drs. Novey and Linker, one of Plaintiff's treating physicians who had previously been identified as a fact witness." Defs.' Reply 7. The Court finds this to be a reasonable and persuasive argument. Second, Plaintiff knew as early as February 3, 2005 that Defendants intended to file a Motion to Exclude the Opinions of Dr. Mark Firth and a Motion for Summary Judgment. *See Joint Motion to Amend Scheduling Order* ("Pfizer will soon file a motion to exclude the testimony of Plaintiff's expert witness, Mark D. Firth, M.D., and for summary judgment."). Despite this knowledge, Plaintiff casually attached the declarations in response to one of these motions and attempted to amend his initial disclosures in April 2005. Plaintiff's actions indicate a lack of substantial justification. Additionally, Plaintiff cannot show that the delay in identifying Dr. Novey as an expert was harmless. Defendants did not have a chance to take Dr. Novey's declaration prior to the Court's stay of discovery pending the outcome of these motions. Thus, Defendants' Motion to Strike Dr. Novey's declaration is granted. The same conclusion applies to Dr. Linker's declaration. Dr. Linker was not timely identified as an expert, and Plaintiff has failed to show substantial justification and harmlessness. The Court also notes that Dr. Linker's declaration pertains only to specific causation. Regardless of whether the Court granted Defendants' Motion to Strike with respect to Dr. Linker's declaration, Plaintiff still has not established general causation.

### C. Dr. Phillips's Deposition Transcript

█ Plaintiff attached the deposition transcript of Dr. Paul Phillips in Plaintiff's response to Defendants' Motion for Summary Judgment. Dr. Phillips's deposition was taken by Mark Cheffo, counsel for Defendant, in a Lipitor case brought in California.[6] Defendants correctly note that Plaintiff has been equivocal about how he intends to use Dr. Phillips's deposition. In his response to Defendants' Motion for Summary Judgment, Plaintiff lists Dr. Phillips's deposition as one of the items of expert testimony that establishes general causation. Then, in his response to Defendants' Motion to Strike, Plaintiff contradicts himself. He states that "Dr. Phillips' testimony is primarily as a fact witness to show why there was not more medical literature on Lipitor's side effects. He cannot provide expert opinions on Mr. Leathers. They have never met." Pl.'s Resp. to Mot. to Strike 13.

As Plaintiff still has not established general causation, the motion to strike Dr. Phillips's deposition is moot to the extent that Plaintiff intends to use Dr. Phillips only as a fact witness. To the extent that Plaintiff intends to use the deposition to establish general causation and avoid summary judgment, the Court agrees with Defendants that the deposition should be stricken. Plaintiff never disclosed Dr. Phillips as an expert (or even a fact witness for that matter) in this case pursuant to FRCP 26(a); therefore, Plaintiff cannot use the deposition to establish general causation.

Plaintiff's only counterargument is that Dr. Phillips's deposition is admissible under FRE 804(b)(1). FRE 804(b)(1) provides an exception to the rule against hearsay for former testimony if the declarant is unavailable and the testimony was given "in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to

---

**6.** *Noeder v. Pfizer et al.,* No. GIC815342 (Calif. Super. Ct. San Diego Co.).

develop the testimony by direct, cross, or redirect examination." Regardless of whether the testimony is excepted from the rule against hearsay, it still contains expert opinions under FRE 702 and is subject to FRCP 26(a)'s disclosure requirement. Thus, Defendants' Motion to Strike Dr. Phillips's deposition is granted.

## V. *Defendants' Motion for Summary Judgment*

The Court now turns to Defendants' Motion for Summary Judgment. The Court finds that Plaintiff cannot establish a genuine issue of material fact with respect to causation; thus, Defendants are entitled to summary judgment.

### A. *Standard of Review*

This Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). In *Celotex Corporation v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988), the Supreme Court held that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

The movant's burden is "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* However, it is not enough in most situations for the movant merely to point out to the court this absence of evidence. *Id.* at 323, 106 S.Ct. 2548; *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Rather, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)).

Only after the movant meets its initial burden does any obligation on the part of the nonmovant arise. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark,* 929 F.2d at 608. Nevertheless, once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548.

All evidence and factual inferences should be viewed in the light most favorable to the nonmoving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (emphasis in original). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Id.* at 250, 106 S.Ct. 2505. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element essential to his or her case so as to create a *genuine* issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Rollins,* 833 F.2d at 1528.

### B. *Analysis*

General causation is an essential element of Plaintiff's prima facie case for each claim asserted in this litigation. That Lipitor can cause Plaintiff's injury "is not a natural inference that a juror could make through human experience." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir.1999). Therefore, "medical expert testimony [is] essential to prove causation in this case." *Id.* Defendants' Motion for Summary Judgment is premised upon the argument that Plaintiff has not presented admissible expert testimony establishing causation. The Court agrees.

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment [# 71].

### VI. *Conclusion*

For the foregoing reasons, Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72] and Defendants' Motion for Summary Judgment [# 71] are GRANTED. Defendants' Motion to Strike [# 98] is GRANTED IN PART and DISMISSED AS MOOT IN PART. Defendants' Motions for Leave to File Excess Pages [# 70 & # 95], Defendants' Motion to File Under Seal [# 75], and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Authority [# 113] are GRANTED NUNC PRO TUNC. The remaining motions [# 78,# 92, # 124, & # 129] are DISMISSED AS MOOT.